| | |
|---|---|
| DO NO HARM, a nonprofit corporation incorporated in the State of Virginia,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM LEE, in his official capacity as Governor of the State of Tennessee,<br><br>Defendant. | No. 3:23-cv-01175<br><br>**JUDGE CAMPBELL**<br>**MAGISTRATE JUDGE HOLMES** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Two Tennessee laws require the Governor to discriminate on the basis of race when making appointments to the Board of Podiatric Medical Examiners (Board). *See* Tenn. Code §§ 8-1-111 & 63-3-103(b). These laws require strict racial set-asides that cannot—and do not—survive constitutional scrutiny. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 228–29 (1995); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506–08 (1989). Governor Lee is tasked with enforcing these statutes, and Plaintiff Do No Harm brought this case to challenge their constitutionality. The Governor now asks this Court to dismiss the case under Fed. R. Civ. P. 12(b)(1). His only argument is that Do No Harm lacks Article III standing to maintain this suit. Mot. Dismiss 1–2. For the reasons that follow, the motion should be denied.

**STANDARD OF REVIEW**

Article III of the Constitution allows organizations like Do No Harm to "assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). For an association to bring suit on behalf of its members, it must show that (1) one or more of its members would have standing to sue in their own right; (2) the interests of the suit are germane to the organization's purpose; and (3) the individual members' participation is not required. *See Friends of the Earth,*

1

*Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018).[1]

At the pleading stage, an association must allege that at least one of its members "would otherwise have standing to sue in their own right[.]" *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). There are no heightened pleading standards to establish standing. *Waskul*, 900 F.3d at 255 n.3. It suffices for a complaint to make "general factual allegations of injury resulting from the defendant's conduct[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). On a motion to dismiss, the Court must accept as true the factual statements in the complaint that support standing. *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543 (6th Cir. 2021).

## ARGUMENT

In its First Amended Complaint (FAC), Do No Harm alleges that it is a nationwide membership organization of over 6,000 medical professionals, students, and policymakers dedicated to eliminating racial discrimination in healthcare. FAC ¶ 6. The Declaration of Kristina Rasmussen, Executive Director of Do No Harm, further confirms this mission. Rasmussen Decl. ¶ 3. Do No Harm has members that are qualified, ready, willing, and able to be appointed to the Board. FAC ¶¶ 6, 9, 35–36; Rasmussen Decl. ¶¶ 5–7. Those members are injured in that they are disfavored for appointments to the Board because of their race. FAC ¶¶ 22–23. Because Do No Harm alleges that its members satisfy the nonracial statutory requirements for appointment to the Board, *see* Tenn. Code § 63-3-103, and they are ready, willing, and able to serve, Do No Harm's complaint satisfies Article III's injury requirement at the pleading stage. *Lujan*, 504 U.S. at 561.

---

[1] The Governor only argues the first element in his motion, and the other two elements are satisfied. The Complaint alleges that Do No Harm's mission is to eliminate discrimination in healthcare, FAC ¶¶ 6, 9; *see also* Rasmussen Decl. ¶ 3. That is plainly germane to the issues in this case. And there is no reason to think that individual participation is needed here.

2

But Do No Harm goes even further in its Amended Complaint. It identifies—with specificity—two individuals who would have standing in their own right. Member A is a licensed podiatrist who has been practicing in Tennessee for over 30 years. FAC ¶ 10; Rasmussen Decl. ¶ 6. He resides and practices podiatry in Tennessee. *Id.* He is disfavored in appointment to the Board because of his race. FAC ¶ 10; Rasmussen Decl. ¶ 6. He is ready, willing, and able to be appointed to the Board. FAC ¶ 10; Rasmussen Decl. ¶ 6. There is no doubt—and Governor Lee raises none—that Member A would have standing to challenge the racial mandates if he sued in his own right.

The same is true of Member B. He is qualified to be appointed as a citizen member to the Board. Member B is a Tennessee citizen and has resided in Tennessee for over 27 years. FAC ¶ 11; Rasmussen Decl. ¶ 7. He does not engage in any profession that is subject to regulation by the Board. FAC ¶ 11; Rasmussen Decl. ¶ 7. He is also ready, willing, and able to be appointed as a citizen member to the Board. FAC ¶ 11; Rasmussen Decl. ¶ 7. He is disfavored in being considered for the Board because of his race. FAC ¶¶ 22–23. As such, he would have standing to sue to enjoin the racial mandates that prevent his equal consideration for appointment to the Board.

To round out this straightforward standing analysis, Defendant Lee causes the injuries to Plaintiff's members because he is required to consider race when making appointments to the Board. FAC ¶¶ 12, 21–23. Plaintiff's qualified, willing, and able members are—and will be—injured by the statutes that Governor Lee enforces. A declaration by this Court that those laws are unconstitutional, and an injunction preventing the Governor from using race when appointing members to the Board, would remedy Plaintiff's members' injuries.

Governor Lee does not dispute this straightforward reading of Plaintiff's Amended Complaint. Nevertheless, Governor Lee moves to dismiss because, in his view, Do No Harm lacks

3

Article III standing to maintain this suit for two reasons. First, he argues that Do No Harm must provide the legal names of its individual members who are injured by the laws. Mot. Dismiss 6–7. Second, he argues that Do No Harm's members are not injured by the challenged laws. Mot. Dismiss 8–10. Neither argument has merit.[2]

### I. Do No Harm Is Not Required to Name Names in Its Complaint

Governor Lee first argues that Do No Harm lacks Article III standing because it "fails to identify any injured members." Mot. Dismiss 5. But that is factually wrong. Do No Harm expressly identified two members who are injured by the law; it just used pseudonyms. FAC ¶¶ 10–11; Rasmussen Decl. ¶¶ 6–7. The Governor's insistence on knowing the legal names of Do No Harm's members has no basis in the law. The argument has been rejected by every circuit court to address it, with the Tenth Circuit adding to this bevy of precedent just last week. *See Speech First, Inc. v. Shrum*, No. 23-6054, 2024 WL 506224 (10th Cir. Feb. 9, 2024).

In *Speech First*, the Tenth Circuit thoroughly and unequivocally rebuked the same arguments advanced by the Governor here. The plaintiff in that case, Speech First, is a nationwide membership organization dedicated to protecting free speech on college campuses. *Id.* at *1. It identified three pseudonymous members who were harmed by the challenged policy. *Id.* In reversing the district court, the Tenth Circuit held that "[l]ongstanding and well-established doctrine in the federal courts establishes that anonymous persons may have standing to bring claims." *Id.*

Much like Speech First, Do No Harm is a nationwide membership organization. It is dedicated to eliminating racial discrimination in healthcare. FAC ¶¶ 6, 9; Rasmussen Decl. ¶¶ 3– 4. Its complaint expressly identifies two pseudonymous members who are injured by the

---

[2] Plaintiff does not argue that Do No Harm has Article III standing in its own right. *See* Mot. Dismiss 11–12.

4

challenged statutes. FAC ¶¶ 10–11; *see also* Rasmussen Decl. ¶¶ 5–7. Factually, there is no relevant daylight between Do No Harm here and Speech First there. This Court should follow the Tenth Circuit's well-reasoned decision.

But it's also not as if the Tenth Circuit was the first to write on this issue. Case after case and court after court have allowed membership organizations to proceed using pseudonyms for their members. Indeed, *every* circuit court that has addressed the issue has come out the same way:

- "[W]e do not know the names of the individuals … but anonymity is no barrier to standing[.]" *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022).

- "[R]equiring specific names at the motion to dismiss stage is inappropriate." *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Georgia*, 833 F. App'x 235, 241 n.8 (11th Cir. 2020).

- "[W]e see no purpose to be served by requiring an organization to identify by name the member or members injured." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

- "We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012).

- Article III "allows for the member on whose behalf the suit is filed to remain unnamed by the organization." *Disability Rts. Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008).

- "[T]he defendants cite to no authority—nor are we aware of any—that supports the proposition that an association must 'name names' in a complaint in order properly to allege injury in fact to its members." *Bldg. & Constr. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006).[3]

And the Sixth Circuit—in a case that challenged the standing of a membership organization—found the pseudonymity of the members unremarkable. *See Doe v. Porter*, 370 F.3d 558, 562 (6th Cir. 2004) ("John Doe and Mary Roe have standing to bring this action in their individual capacities, and are members of the [plaintiff organization].").

Against this tidal wave of uniform precedent, the Governor offers cases that are not helpful. In *Summers*, 555 U.S. at 498, the Supreme Court dealt with the standing of an organization that made generalized allegations of harm to its members. *Id.* The Court held that the association plaintiff failed to make "specific allegations" that an "identified" member would suffer harm. *Id.* The case has nothing to say about pseudonyms.

For starters, *Summers* was on final judgment—where the burden to show standing is much greater than at the pleading stage. *See Lujan*, 504 U.S. at 561 (Plaintiff's burden to show standing increases throughout "the successive stages of the litigation."). Here, of course, the case is at the pleading stage, and Do No Harm's allegations—that it has members who meet all nonracial qualifications to be appointed to the Board but are subject to racial discrimination because of the challenged laws—must be presumed true. *Id.*; *see also* FAC ¶¶ 10–11; Rasmussen Decl. ¶¶ 5–7.

---

[3] Recent district court decisions are similar. *See, e.g.*, *Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*, No. 23-CV-08262 (PMH), 2024 WL 36026, at *8 (S.D.N.Y. Jan. 3, 2024) ("Identification by name is not necessary where, as here, a name will not inform the pertinent inquiry of whether a person will be denied the opportunity to compete[.]"); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, No. 1:23-CV-3424-TWT, 2023 WL 6295121, at *3 (N.D. Ga. Sept. 27, 2023) ("*Summers* does not require that the Plaintiff name its injured members by name[.]").

But even if *Summers* applied at the pleading stage, Do No Harm satisfies its commands. *Summers* required an association to identify members who are harmed with specificity; it has nothing to say about whether those members could be identified using pseudonyms. *See Speech First*, 2024 WL 506224, at *4 ("*Summers* itself in no way involved the use of pseudonyms, so there was no reason for the Court to distinguish between legal names and pseudonyms."). Especially at the pleading stage, Do No Harm has more than adequately made "specific allegations establishing that at least one identified member had suffered or would suffer harm." 555 U.S. at 498; *see also* FAC ¶¶ 10–11 (identifying two members who will suffer direct harm); Rasmussen Decl. ¶¶ 5–7 (same).

The Governor fares no better with *Association of American Physicians & Surgeons*, 13 F.4th at 531. That case dealt with an association that lacked standing to challenge the FDA's restriction of a drug used to treat COVID-19 patients. *Id.* at 535. While the Sixth Circuit concluded that the organization did not identify any members who would have standing, *id.* at 544–47, it was not because of the members' pseudonymity. Instead, the two *theories* of standing that were pled failed as a matter of law: the first because it was based on a misreading of the FDA's guidance, *id.* at 544, and the second because the injury alleged was not caused by the FDA. *Id.* at 546. Indeed, if pseudonymity were enough to kick an organization out of court, the Sixth Circuit would not have spent so much ink on the alleged injuries to the members, while treating their pseudonymity as unnoteworthy. *Id.* at 543 (noting that the identified members use pseudonyms, i.e., "Dr. John Doe").

The Governor's remaining authorities are similar. *Waskul*, 900 F.3d at 250, says nothing about the use of pseudonyms. The association lacked standing in that interlocutory appeal solely because the named plaintiffs were ineligible to seek the requested relief. *Id.* at 256–57. Likewise,

pseudonyms were not at issue in *Michigan Association of Public School Academies v. United States Department of Education*, No. 1:22-CV-712, 2024 WL 455079 (W.D. Mich. Jan. 10, 2024). The district court there held that the plaintiff lacked standing because it failed to identify *any* members who were directly injured. *Id.* at *4. And *Friends of Georges, Inc. v. Mulroy*, No. 2:23-CV-02163, 2023 WL 3790583 (W.D. Tenn. June 2, 2023), said nothing about the use of pseudonyms to identify members and only concerned the failure to identify *any* members who were injured.[4] *Id.* at *10–11.

But of all the Governor's off-point authority, *Doe*, 370 F.3d at 558, is the least helpful to the Governor's argument. The Governor cites the case for his discussion of pseudonymous *parties* and how that is disfavored under Rule 10(a) of the Federal Rules of Civil Procedure. But this case does not involve a pseudonymous party; Do No Harm is the named plaintiff here. What is most noteworthy about *Doe* for present purposes is that the Sixth Circuit, as noted above, found that the membership organization had standing to sue on behalf of its members even though the organization only identified them using pseudonyms. *Id.* at 562.

In sum, the overwhelming authority permits associations to bring claims on behalf of their pseudonymous members. The Governor's strained reading of *Summers* has been rejected time and again. For good reason: it goes against the very purpose for organizational standing. "[T]o hold that Article III requires an organization to name those of its members who would have standing would be in tension with one of the fundamental purposes of the organizational standing

---

[4] *Friends of Georges* was a final judgment after trial, meaning that the court allowed the association to proceed through the successive stages of litigation without having identified in the complaint any individual member who was harmed by the law. In ultimately rejecting associational standing, the Court rightly recognized that trial standards for demonstrating standing at trial are manifestly different than pleading standards. *See Friends of Georges*, 2023 WL 3790583, at *11 n.11. Here, not only are we at the pleading stage, but Do No Harm has identified two members with specificity.

8

doctrine—namely, protecting individuals who might prefer to remain anonymous." *Students for Fair Admissions*, 2023 WL 8806668, at *9.

II.     **Do No Harm's Members Have Cognizable Injuries and Their Claims Are Ripe**

It is hornbook law that the injury in an equal protection case "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). When it comes to racially discriminatory barriers to government offices, the Supreme Court explained that "members … do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications." *Turner v. Fouche*, 396 U.S. 346, 362 (1970). Here, Do No Harm alleges that at least two of its members face a racial barrier in appointment to the Board. FAC ¶¶ 10–12; Rasmussen Decl. ¶¶ 5–7. Those allegations are plainly cognizable under Article III. "The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." *Turner*, 396 U.S. at 362–63.

Against this straightforward backdrop, the Governor incorrectly claims that Do No Harm lacks standing and that its claims are unripe because "no foreseeable openings for the Board are subject to the challenged acts until at least 2027." Mot. Dismiss 9. This is untrue both legally and factually.

The legal hole in the Governor's argument is dispositive. Even if one were to assume his factual statements were true—that discriminatory Board decisions won't happen until 2027, Mot. Dismiss 8—that is sufficiently imminent to support standing as a matter of law. The Sixth Circuit has held that a harm that is years in the future will support standing if that harm is sufficiently certain. *Thomas More Law Ctr. v. Obama*, 651 F.3d 529 (6th Cir. 2011), *abrogated as to other issues by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). Here, there is statutory

9

mandate that the Governor must consider race in appointments to the Board sometime between now and 2027.

In *Thomas More Law Center*, the court considered a challenge to the standing of plaintiffs who sought to overturn the Affordable Care Act. 651 F.3d at 535–36. It held that the plaintiffs had established an imminent injury because they would be required to purchase health care coverage as of the effective date of the Act, which was not until three-and-a-half years after the complaint was filed. *Id.* at 536. The court explained that "[i]mminence is a function of probability" and concluded that because there was a "virtual certainty" the plaintiffs would be required to purchase insurance, their claims could proceed. *Id.* at 538; *see also Bassett v. Snyder*, 951 F. Supp. 2d 939, 951 (E.D. Mich. 2013) ("[T]he relevant inquiry is whether a future injury is likely to occur, not when it will occur."). The court further noted that the Supreme Court "has allowed challenges to go forward even though the complaints were filed almost six years and roughly three years before the laws went into effect." 651 F.3d at 537 (citing cases); *see also Mead v. Holder*, 766 F. Supp. 2d 16, 26 (D.D.C. 2011) (about three years); *Village of Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) (over thirteen years). Here, *Thomas More Law Center* resolves the Governor's argument. The harm to Members A and B is certain. Dr. Khumalo's term will come to an end less than three-and-a-half years from now, at which time the challenged statutes require the Governor to consider race in making appointments. That makes Do No Harm's members' injury sufficiently imminent to satisfy standing.[5]

---

[5] It also distinguishes *Pucci v. Michigan Supreme Ct.*, 601 F. Supp. 2d 886 (E.D. Mich. 2009), a pre-*Thomas More Law Center* case that Defendant relies on. *See* Mot. Dismiss 8. In *Pucci*, the court declined to find standing because the plaintiff's desired court administrator position "is currently filled." 601 F. Supp. 2d at 897. But unlike Board positions, the court administrator position in *Pucci* was of indefinite duration, not for a set term that would expire in just a few years.

Defendant hypothesizes that "the alleged harm may … never come to pass" because, by 2027, Member A may no longer be ready, willing, and able to serve on the Board; or the General Assembly may amend the statutes; or the Board's appointment requirements may change. Mot. Dismiss 10–11. But *Thomas More Law Center* rejected these precise arguments as insufficient to undermine standing or create a ripeness issue. The court rejected the argument that harm was not imminent because the plaintiffs could "leave the country or die" or "Congress could repeal the law." 651 F.3d at 537. "[T]hese events," the court held, "are hardly probable and not the kinds of future developments that enter into the imminence inquiry." *Id.* (quoting *Riva v. Massachusetts*, 61 F.3d 1003, 1011 (1st Cir.1995) ("[I]t is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable.")). Likewise, Defendant's speculation about possible changes to Member A's availability to join the Board or the governing legal framework do not even "enter into the imminence inquiry." As in *Thomas More Law Center*, "[t]here is no reason to think that [Do No Harm's members'] situation will change" and "there is no reason to think the law will change." 651 F.3d at 538.

Aside from the fatal legal problems with the Governor's hybrid standing/ripeness[6] argument, it fails as a factual matter for three reasons.

**First.** Although the Governor claims that his recent appointee Dr. Khumalo "is African American," Mot. Dismiss 9, he provides no evidence upon which the Court can rely for that fact. Dr. Khumalo's race is not mentioned in his appointment letter, *see* Mot. Dismiss Ex. A; his oath

---

[6] Where the standing question "concerns the imminence of the plaintiffs' injury, standing analysis parallels ripeness analysis." *Thomas More Law Ctr.*, 651 F.3d at 537–38.

11

Case 3:23-cv-01175   Document 26   Filed 02/16/24   Page 11 of 15 PageID #: 127

of office,[7] or the Board website's listing of members.[8] And the Governor has provided no other evidence that Dr. Khumalo (or any other current Board member) is a racial minority. Thus, there is nothing that would allow this Court to accept Defendant's assertion that "the Board currently has a member who belongs to a racial minority." Mot. Dismiss 9.

**Second.** Even accepting Defendant's unsupported assertion that Dr. Khumalo is a racial minority, there is no guarantee that he will remain on the Board until the end of his term. Vacancies can and do arise prior to the expiration of a member's term, such as when a member resigns, passes away, or is removed. *See* Tenn. Code § 63-3-103(d) (discussing how the Governor is to fill vacancies).[9] Nor is there any timetable upon which the public can expect or anticipate gubernatorial appointments to the Board. Indeed, as Do No Harm alleged in its First Amended Complaint, based on all publicly available data when it filed its initial complaint, the Board had vacancies for podiatrists but no vacancy for a consumer member. FAC ¶¶ 25–30. Yet based on the Governor's statements now, both of those appear to be false. "These inconsistencies and governmental vagaries underscore the volatility of Board membership." *Id.* ¶ 31. Given this Board volatility, the Governor may be required to use race in his appointments to the Board as early as next week.

---

[7] Dr. Khumalo Oath of Office, https://tnsos.net/publications/oa/files/44881.pdf (last visited Feb. 15, 2024).
[8] *Board of Podiatric Medical Examiners*, Tennessee Department of Health, https://www.tn.gov/health/health-program-areas/health-professional-boards/podiatric-board/podiatric-board/members.html (last visited Feb. 15, 2024).
[9] This is not merely a hypothetical possibility. The current vacancy on the citizen seat arose because the prior Board member, Martha Oglesby, passed away before the expiration of her term. *See Meeting Minutes Tennessee Board of Podiatric Medical Examiners* (Dec. 17, 2021), https://www.tn.gov/content/dam/tn/health/healthprofboards/12-17-21-Minutes.pdf (Board minutes from December 17, 2021, noting Mrs. Oglesby's passing).

**Third**. Even if the Governor had established that there is presently a racial minority on the Board, that does not undermine Plaintiff's standing. Both statutes direct the Governor to continuously "strive to ensure" minority racial representation on the Board. *See* Tenn. Code §§ 8-1-111 & 63-3-103(b). These directives necessarily drive every appointment, as the Governor must consider the race of each candidate and actively seek to ensure minority representation. That directive—and Plaintiff's injury—does not disappear once a single racial minority is appointed to the Board, as the "at least one" formulation establishes a baseline, not a limit. FAC ¶ 23. Put simply, *every* appointment to the Board involves unconstitutional weighing and consideration of a candidate's race.

\* \* \*

In any event, at a bare minimum, the Governor will be required to use race in his appointments to the Board sometime in the next three-and-a-half years. Circuit precedent is unambiguous that such a timeframe neither unripens a case nor undercuts a plaintiff's standing. *Thomas More Law Ctr.*, 651 F.3d at 536–38.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss should be denied.

DATED: February 16, 2024

             Respectfully submitted,

             /s/ Joshua P. Thompson
             Joshua P. Thompson, Cal. Bar No. 250955*
             PACIFIC LEGAL FOUNDATION
             555 Capitol Mall, Suite 1290
             Sacramento, CA 95814
             Telephone: (916) 419-7111
             JThompson@pacificlegal.org

             Daniel J. Turklay (#034600)
             Turklay Law
             11205 Lebanon Rd #51

Mt. Juliet, TN 37122
Telephone: (615) 838-5903
Fax: (888) 868-0014
daniel@turklaylaw.com

Laura D'Agostino, Va. Bar No. 91556*
PACIFIC LEGAL FOUNDATION
3100 Clarendon Boulevard, Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
LDAgostino@pacificlegal.org

*Attorneys for Plaintiff*

**Pro Hac Vice*

**CERTIFICATE OF SERVICE**

      I hereby certify that on February 16, 2024, the forgoing document was served upon counsel for the defendant via CM/ECF service.

                                                  /s/*Joshua P. Thompson*
                                                  Joshua P. Thompson